We have three argued cases this morning. The first one is number 162121, Texas Advanced v. Intersil Corporation. Mr. Pistanis. Thank you, Your Honor, and may it please the Court. I propose to take the issues in this order unless the Court wants me to go in a different direction. First, I'll address the fact that there should be no trade secret liability here. The one-to-one ratio that's at the core of this case is the subject matter of the 981 patent, and the other alleged secrets either taken alone or in combination were either not secret or not misappropriated. Can I interrupt you right there? Please. The trade secret, the technical trade secret, that I understood to be at issue was not simply one-to-one ratio. It's a two-part, one-to-one ratio and interleaved or alternating, and the testimony that, including the testimony you cite, discusses both of them. When I look at what is, I take it, the key to your argument for why this was disclosed, it's claim one, which just talks about implicitly one-to-one but doesn't talk about an interleaving with one-to-one, so I'm not sure why that gets you where you need to go and whether you have anything else to help you get there. I do have more, Judge Toronto. First of all, in the claims themselves, it says that the open and the shielded one must be proximate to one another. That's one. Secondly, look at figures two and three of the patent. You will see an interleaved pattern in those circumstances of open and closed. It may not be one-to-one. For other ratios, right. For other ratios, in fact. Of course, one-to-one is disclosed in other places, but Judge Dyck, I'd like to step back there for a second and say that I think that the inquiry under Texas law is not just whether this is within the written description or enabled under the patent law, but the Texas law, as set forth in cases like Wellogics, which is cited repeatedly by my friends, as well as the Texas Supreme Court's decision in Lucas, say that it is whether it is drawn to the subject matter of the patent. What seems to be striking in this case is that the same patent claim, the same limitation, was said to be both infringed by our devices, but also a trade secret. Which is it? Does it belong to the public? It's not the same thing. You can think of the trade secret as essentially, if there had been, a dependent claim, which doesn't exist. Namely, one-to-one and interleaved. And it might well have been a perfectly proper dependent claim, but that's not in the patent. So you can infringe the one-to-one without having disclosed, while practicing something not disclosed in the patent, namely the alternating patent. But Judge Toronto, that was exactly my point to Judge Dyck, and that is that the Texas law uses the term subject matter of the patent. That's the ratio, and the interleaving is the subject matter of the patent. Now, if there was an additional element of our invention, of our device, the accused device or the at issue devices, say it had a handle on it, or something that wasn't covered by the claims, and that handle had been a trade secret, well then maybe. And that would make it much more like the Fifth Circuit's decision in Phillips v. Fry. That was the one involving the tree stand, the hunting tree stand. And that's the sort of case where a patent and a trade secret can coexist comfortably. The patent is drawn to the tree stand. The trade secret is for the method of, a special method of making the tree stand that isn't disclosed in the patent. But here the subject matter of the patent really put Tausch to an election. Once they got the patent, they covered that subject matter. They covered, and in fact, they say that that is met, and we don't dispute that the one-to-one ratio interleaved is met by, in the claims. But the fact of the matter is that then they ought to have a patent claim. They of course don't have a patent claim because of the separate and distinct monolithic requirement that isn't satisfied here. But if I can just walk through very quickly our case with regard to the absence of a secret here. Could I ask you, suppose we were to, as I understand it, there are basically three alleged trade secrets involved here. One is the one-to-one ratio with the interleaving. The second one is the bill versus buy, and the third one is the use of plastic. Suppose we were to agree with you on some, but not all of your arguments with respect to the trade secrets so that the verdict is set aside with respect to, let's say hypothetically, one trade secret, but not as to the other two. What do we do then? I think in that hypothetical circumstance, you have to remand for a new trial, at the very least on damages. Because if, for example, you say that the one-to-one ratio, and of course there are other reasons that you have to remand on damages anyway. But there's no a permitted use under the agreement. That couldn't support a $48 million judgment here. The plastic, by the way, was already within Intersil's plans, and I want to make sure that the court understands, and I want to direct the court to page A30499. That is an Intersil product proposal dated a good four months before the confidentiality agreements in this case. That already said that they were going to use lightweight, inexpensive packaging, the plastic packaging that is said to be a trade secret here. That wasn't a trade secret at all. In fact, with regard to the technical, the product aspects of it versus the, what I guess I'd separate out and say are the evaluative or financial aspects of the claimed trade secrets here. The technical ones, everything but the one-to-one ratio is already disclosed at A30499. You've got the I2C, you've got the analog-to-digital converter, and you've got plastic packaging. The only thing you don't have is the one-to-one ratio, and we say that's within the subject matter of the patent, so no technical. But apart from that, you're arguing also that it could have been reverse engineered at some point? Yes, that's right, because by the time that Taos came to market, and they came to market with their product in early 06, we did in fact reverse engineer. And it went very fast, if I remember. It did go very fast. There wasn't much of a secret there at all to the extent there was anything at all, and we started and finished in January of 2006. Does that cover the whole period of the claim, the reverse engineering? Well, I think what it would end up doing is significantly eliminating damages in this case, because if you were to... It wouldn't cover the whole period. It wouldn't cover the entire period, but it would cover most of the period, because if you take the reverse engineering and say, okay, from that point, that's when we started engineering our own devices, then it would be 22 months. It still would have been, by the way, developed well before we contracted with Apple, which was, of course, the gravamen of this case was the Apple contract. Can I ask you, I realize this is switching around a little bit, but it's related to what happens if something needs to be remanded. Do I understand correctly that your argument that disgorgement is, for the judge, not the jury, is a point about who needs to decide the monetary relief, not who needs to decide whether there was a misappropriation? That's correct. We've never claimed that the misappropriation decision is an equitable one, but the disgorgement one is absolutely equitable under Supreme Court precedent. If I could, again... I'm hoping to be nimble enough to go back and forth. I'm sure you will be. I'll interleave, if you will. The question I have goes to the evidence of gross versus net profit. With respect to, as I read the Texas case, the ERI case, I guess, which came out slightly before the MGE case that you rely on, but the MGE case doesn't cite it, so I'm assuming the MGE case, the court was not aware of that decision. That decision seems, as I read it, to suggest that there is, in fact, some burden on the defendant, at least to come forward with evidence, some evidence, showing a reduction in the profits from the level that was asserted by the plaintiff. Now, my question to you is, what in Mr. Ratliff's testimony do you find that constitutes a sufficient level of proof to satisfy that sum evidence requirement? Well, I think... Excuse me. I'm losing my voice a little bit here, Judge Brice. It's a very short segment of his testimony. It is a short segment, and of course, the answer is that there were these costs.  And I think that the Texas case... Well, how do I know? I mean, what is he... He doesn't say much, by way of detail, about the costs. He just sort of alludes to the fact that there can be these kinds of costs. And he's citing... Well, he's testifying. This is a little frustrating, but he's referring to a chart, which, as far as I can see, is not in our appendix. It is in the record, and we can get that to you if you think it would be helpful. I think it's Exhibit 300A. Am I correct about that? I think that's correct. Okay. So we probably should have that. And we'll get that to you by a letter after this argument. But that was in evidence, I take it. It wasn't just a demonstrative, correct? That is, again, Judge Brice, and that's my recollection. It was just a demonstrative. It doesn't exist, for purposes of the record. Well, of course, of course. Right, okay. But if you could tell me what it is that he said that gets you past the ERA standard. And I assume you would agree that the ERA is the right standard. Well, I think, actually, MGE is the right standard, because that's the later decision. It's from the Fifth Circuit. It's exactly on point. Well, but the Fifth Circuit is just making an eerie-type guess. Well, and that's right. And the ERA case is a Supreme Court, Texas decision. Presumably, if we conclude that there's a tension between the two, we have to go with the Texas case. Well, I'm not sure that's right, but assuming that it is, Your Honor, if you take the ERA case on its face, I think the burden that it puts on us is not a burden of proof. It doesn't shift the burden to us, but it's a burden of production, or at least identifying. And Mr. Ratliff certainly did identify the components of damages, or the components of expenses that needed to be extracted. And among those were, of course, research and development costs, marketing costs, and, of course, these are the deductions to get to net profits, and that doesn't even take into account the apportionment issues, which, of course... Well, I think he did provide evidence as to the amount, because, in fact, he came up with a total of $7.9 million after deductions with regard to disgorgement. Well, that evidence would better be on the exhibit, because it wasn't in his transcript. It certainly was backed up with evidence that was put forth at trial, and, of course, we apologize for that. Put forth in the form of that Exhibit 300X? Yes. So, just to be clear, your argument about disgorgement being equitable really doesn't have anything to do with the sufficiency of the evidence. In other words, the way the district court conducted this trial, the evidence was supposed to be put before the jury. You're not claiming that you should have had an opportunity to supplement that evidence when it came time for the judge to decide the issue? We are not claiming that that is the error. We might have had that opportunity had the judge, in fact, followed what he was saying initially, but we're not standing here resting and saying we held something back. What we are saying, though, is that an impartial adjudicator would do a much better job of doing the sort of deductions and apportionment that are necessary here. In addition, a judge, rather than a jury, would have to issue findings under Rule 52, which would essentially show the court's work to this court and make appellate review much better. And, quite frankly, we're much better off with Rule 52 findings in terms of appellate review than a black box jury verdict. But those are the practical reasons. The legal reason is simply this, that it's an equitable determination. The Supreme Court has repeatedly said that disgorgement, because it's not damages, but it's measured, in fact, by the allegedly wrongful gains of the defendant, is an equitable remedy. Well, what about the theory which has popped up in a number of cases that disgorgement isn't necessarily, and in all instances, equitable because it may be used, in certain circumstances, as a proxy for the losses suffered by the plaintiff. And several of those cases are cited. The Black & Decker case, for example, has a lengthy discussion of this and concludes that in the setting in which the purpose is compensatory as opposed to either punitive or deterrents, that it's not only is it legal, but it is a juryable question. Why isn't that the correct way to look at the question? Well, first of all, I think you'll search this record in vain for any indication that the disgorgement award here was meant to be compensatory. Well, the judge instructed the jury that compensation was the purpose of the award. So you can start there. Well, you can start there, but then when you look at the evidence and you look at what elements went into that, for example, it was entirely Intersil's lost profits. It was not, there was no showing that Taos would have made these sales. In fact, it's pretty telling that they didn't make a lost profits claim on their patent claim or alternatively on their trade secrets claim. They made a royalty claim. And it's further telling, I think, that it wasn't compensatory because the royalty claim was but a fraction. And royalties are true, real losses. Those are the lost royalties that they would have had. The royalty claim that they made in this case was a fraction of what the disgorgement claim was and what the disgorgement award, which was to the penny what their experts said without any deductions and without any allocations. So the fact of the matter is that, you know, no matter who the decision maker is, it's too big. But with regard to who the decision maker is here, this award did not have anything to do with their losses. It had everything and only to do with our gains. And if you look at the way that the jury was invited to penalize us, you certainly see that as well. Can I ask you a question which is, I guess, jumping around in topics? On the assumption, the purposes of this question, that patent infringement survives, there's a question about what, if anything, to do with the district court's ruling that eliminated 99 percent almost, I think, of the potential sales that might have been covered by the royalty. The Supreme Court, I think, has pending a cert petition on the Western Gecko case. Does that case have a bearing on this? Because it has something to do with domestic versus extraterritorial events covered by, I think, in that case, a lost profits award. But if I remember right, there's discussion in the cert petition, at least, and in the government's invitation brief of the royalty counterpart to the profits. Right. And I've read all of those papers, and the court did not act on that petition this morning. What I can tell you about Western Gecko or Gecko or Geeko, I'm not really sure yet, at this point, how to pronounce it. I'll learn eventually. I'm sorry, I realize I'm into my red light time, Your Honor, but I'm here. The Western Geeko case involves a 271F claim. It involves a claim that is, by its nature, cross-border. It's one of those from the provision that was added after Deep South for sending components overseas and having them assembled and brought back. This is a 271A and only a 271A case. It's not even a contributory infringement case. Am I remembering right that the crucial precedent that's at least discussed in the government's invitation brief is the power integrations case, which was not a 271F or G case, but an A case, and therefore, what the Supreme Court has to say, assuming it takes the Western, let's call it, Geeko case, might have some bearing on whether... I can't tell you right now, if the court takes that case, what its decision will look like. I'm telling you that I think that Western Geeko involves a very different section of the infringement statute, and it's unlikely to affect this case, which is strictly a 271A case. Well, they haven't argued with anything. Well, that's right. That's right. I take it your position with respect to the extraterritoriality issue, which came up as a summary judgment issue, is that they didn't present enough evidence at the summary judgment stage to get by the Rule 56 standard. Right. And in fact, although it wasn't our burden, we did. Although this is a cross-appeal issue, and I'm sure my friend will address this when he stands up, the facts with regard to the extraterritorial liability are set forth in Mr. Aji's declaration, which is at A12456 and 57. And this is important. The location of the sale, as Mr. Aji set forth with regard to that 98.8, was not from Intersil Corporation, the defendant in this case, but from Intersil's affiliate companies in Kuala Lumpur and in Hong Kong. So, Judge Toronto, your opinion for the court in Carnegie Mellon seems to suggest that you've got to have either a making or a using or a selling somewhere in the United States. They don't have making or using. In fact, all that's taking place across border. And then, although they have lots of evidence that they throw up about, you know, precatory discussions that may or may not have taken place in the United States, the simple fact is that the sale didn't even involve Intersil Corporation, let alone did it take place in the United States. I realize the court has been very indulgent with my time. I've sort of skipped over the patent issue, but I want to raise that issue very quickly so that my friend has an opportunity to respond to it. Our point with regard to the patent issue is a very simple one, that although one-to-one and interleaved is disclosed in the patent, and so it's not a trade secret, there is not infringement here because the patent also requires that the detector be monolithic. The facts in our case, which are undisputed, unvarnished, in fact, not even responded to in my friend's brief before this court, are that when the chips are sold, they cannot perform the mathematical operation that's required by the last portion of the independent claim one, the mathematical subtraction or addition or whatever it is that has to happen there. The only way that can happen is if an I2C, you'll recall that from the trade secret aspect of the case, an intra-integrated conductor off-board, off the chip, commands the chip to switch into a mode that allows that to happen. But the chip itself can't do that. The only way the chip can do it is by having a non-monolithic component to it. But isn't that like saying that an on-off switch which allows the component to operate in the way that it was designed to operate is part of the component? I mean, you may have to turn on a circuit breaker in order to make your refrigerator run, but I doubt you would say that the circuit breaker is part of the refrigerator. Isn't that what we've got here? I don't think it's that at all, Your Honor, first of all because, as we pointed out also in our brief, there's no evidence that anyone, anyone has operated these devices. No, but it's a capability issue. Well, right, but the claims aren't drawn to capability. And then with regard to what has to happen, the one thing about the refrigerator that you're hypothesizing is that they wrote the patent and required it to be monolithic. And they got the judge to construe the term monolithic and to say that monolithic means formed on a single chip. And that's, you know, we're just holding them to their claim language with regard to that issue. And I hope the court will indulge me on rebuttal. We'll give you two minutes for rebuttal. Mr. Alibi, is that how you pronounce it? Yes, Your Honor. May it please the court. This was a case in which Intersil tried to buy Taos because its ambient light sensor program could not reject infrared light. One of the key aspects of an ambient light sensor. After Taos disclosed how its products do that and how its next generation products were going to do that and the due diligence talks ended, then Intersil copied the next generation product, the TSL2560, which had the interleaved one-to-one ratio. On the one-to-one ratio, if I recall correctly, your brief doesn't really respond to the reverse engineering point. Am I correct about that? No, Your Honor. Our point is that under Texas law, including the K&G case by the Texas Supreme Court, if you find out about something confidentially and misappropriate that information, you cannot later claim that the product either became available publicly or that you reverse engineered it after you misappropriated it. If you could reverse engineer it, wouldn't that put an end to the damages period? No, not under K&G. In Texas, unlike patent infringement law, misappropriation is a single tort. It occurs when you misuse the information, when you use improper means. And so the improper means here was a breach of this duty of confidentiality. I understand that, but I'm asking about damages. Under Texas law, can you, for example, claim trade secret damages for a period after which the trade secret becomes publicly available? With respect to somebody that's misappropriated a trade secret prior to the time that it was publicly available, yes. The Willogics case discusses that in passing. The K&G case talks about it a little bit more about the misappropriation, not about the damage side. But here, there's no evidence that they relied on the reverse engineering whatsoever. There's no evidence that they were using the reverse engineering or anything public, even the patent they've talked about on appeal to make their new product. What Intersil did, under the evidence that was shown, was that it used the next generation product, the TSL-2560, that Taos was releasing. And the important thing... Where do you discuss this K&G case in your work? It's just a single citation to page 70. Page 70, Your Honor. So I don't see that you're... addressing this damages question. That's meant to address it, is that the reverse engineering doesn't absolve the prior use of misappropriated trade secrets. Nor is there any evidence in the trial court that there was use of the reverse engineering whatsoever. I don't think the theory is not that they used the reverse engineering, but that the trade secret became publicly available because it could be reverse engineered at some point and that that should stop the damages. But go ahead, I understand your point. And the damages that flowed from their misappropriation was building an entire line of products that competed with Taos based upon the misappropriation. And that misappropriation, although it occurred in 2004,  that came out between 2004 and 2006. So all these products were continuing to be sold. You're just basically saying that's irrelevant. It's irrelevant because the products have already been released and are competing with Taos and they were based upon a misappropriation of trade secrets. And that would be true. There's no end to the liability. I mean, this was carried up through 2014, but only because that was the end of the period within which evidence was available at the time Had Dr. Ugalin had additional evidence going through the present, would that all go to increasing damages? The question is really, does this never end? Is there ever a cutoff? For a misappropriated product, no, because it's competing. And the point is of trade secret law to prevent somebody from taking the trade secret and competing with you. Even though it's clear to everyone in the industry, including the defendant, that the product, how the product works and that it's on the market and it's readily discerned as to how it works. Still, the damages continue to accumulate with respect to the defendant. Because unlike patent law, misappropriation is a single tort. It occurs at one fixed time. It's not based upon each sale. It's just the damages that are... The fact that it's a single tort necessarily means that it's a single and unending liability. Seems to me these two questions are different. I understand that and it goes to whether the issue is what damages reasonably flowed from the misappropriation, from creating an entire line of ambient light sensors that competed and continue to compete. The evidence was that even at the preliminary injunction hearing that occurred in this case, that they were still selling this device, mainly the 29003. That was the main selling device of all of the different devices, the 19 that incorporated the trade secret information. But the trade... Is Texas law different in this respect from general trade secret law? It's a little bit different in some senses because Texas had not yet adopted the Uniform Trade Secret Act and so it's using common law principles regarding damages, not some statutory basis for damages. Under the Uniform Trade Secret Act, the damages stop when trade secret becomes publicly available? I've not seen cases on that subject, Your Honor. Well, perhaps this is where you were going. Could you address the question of the net versus gross profits and in particular whether Mr. Ratner's testimony as supplemented by the chart that he was using during his testimony. Was that, by the way, Exhibit 300A that he was using? I'm not sure what exhibit he was using. But anyway, he was using a chart, I take it. That's correct. It had a number of numbers on it, I gather. Why did his testimony not satisfy the requirement under ERI for showing some evidence to reduce the profits from the gross down to the net? Because what his testimony is and he discusses is, number one, he assumed that every category of expenses that he was talking about and it's not clear what categories they are, but he says every category of expense that exists that Intersil has applies to this line of products. That's the first assumption and that's Appendix 21135. He then assumed that for a company that's a multi-billion dollar corporation and this product line was one percent of all revenues that all those costs applied in the same pro rata portion as they did for this line of business as they did to the entire corporation and that's at A22112. What Dr. Ugone testified in converse to that was that's not reliable to assume that a cost exists without any Intersil documentation, without Intersil testimony that those costs existed or existed in that proportion and based upon those two assumptions and guesses that he makes, estimations that he makes, it was not reliable evidence. Even if it were, then the point becomes that under ERI they've said we think these costs exist and there's no error. The jury's allowed to determine whether to believe Dr. Ugone or Mr. Ratliff as to whether these expenses really exist and given that there's not a single Intersil document or Intersil representative testimony to support the existence of those costs, Dr. Ugone had subtracted all direct costs attributable to this product line and not used revenues but a profit calculation. On the question of whether the disgorgement remedy is equitable or legal for purposes of a jury trial right, what do you think is your strongest case in support of the notion that disgorgement is a legal remedy not an equitable remedy? There are a lot of cases that say such as Terry that say disgorgement is an equitable remedy but your argument as I understand it is that no in this particular case it's not and what is your best case for that proposition? Hard to answer that question as to the best case. There are not many cases that talk about the jury trial right in the context of disgorgement particularly in the trade secret area. I think in fact none. It's not a trade secret case. It's not a trade secret case. I believe there's a recent case and I can get your honor the complete site which is T-Mobile versus Huawei Western District of Washington 2017 in which that issue did come up and the issue of disgorgement was submitted to the jury the court found that it was a jury question it was a trade secret case. Did that depend on it being compensatory? Well I think that's part of the test part of the test is Well suppose we were to decide here that the disgorgement claim was not a compensatory claim then it's equitable isn't it? It could be but the claim is legal and there's no dispute about that. That's not always legal right? No the claim of trade secret misappropriation is always a legal claim. No, no, no. It's disgorgement. And because under Texas law the remedy is four measures under wellogics four different measures that you can use for determining damages Texas law has decided that this is compensatory and so based upon Well they've decided that these are remedies it doesn't necessarily follow that A that it's compensatory or B that it's therefore legal or C that it's therefore jury trial Well the third would follow from the second presumably. The first question is is this a question of damages that are compensatory and Texas says in the event that you have trade secret misappropriation By virtue of the use of the term damages you're saying that necessarily means it's compensatory? That's the first part yes your honor and I'd also say that you have to look I'm sorry just to be clear you said Texas law uses the term damages as an umbrella term to refer to several different forms of monetary relief including discrimination Absolutely In the Wilogics case the sentence is that when somebody misappropriates a trade secret you're entitled to actual damages actual damages in a misappropriation case there are four measures So what they're saying is one But that doesn't say that if the discouragement remedy is non-compensatory that that should be treated as damages does it? No but damages according to Dairy Queen and the United States Supreme Court are traditionally a legal claim so what Intersil would have you hold is that somehow damages when it's based on one measure versus another measure under trade secret law under Texas law somehow became equitable when Texas has never held that and in fact I'm not aware of any court But Texas law doesn't tell us whether it's equitable Well we know that many cases in Texas do go to jury trials on this issue But that's irrelevant I mean that's a federal question as to whether it's an equitable or a remedy that is to be tried by the court or a legal remedy that's supposed to go to the jury It is a federal 7th Amendment question but we do look to the underlying law to see what the situation is That's what Dairy Queen did I think that's an important case because they looked at the nature of the claim and they looked at the nature of the relief They said that since the merger of law and equity these distinctions about what we call it although we all learned in law school that disgorgement may be equitable that's changed in the terms of what is it The Kokish case from the U.S. Supreme Court in 2017 distinguished when we're talking about SEC actions and versus a private action What type of claim it is So it does depend We can't just say disgorgement as a whole is an equitable remedy I think it matters what type of relief is being requested and what type of claim it's being requested for I'd also like to address Your Honor you had asked the question that if you find that one trade secret or one issue that under this Court's holding in Northpointe I believe that was your opinion Judge Bryson as well as the but not on that issue was that it was it's not necessary for every possible factual basis for liability to be independently sufficient Carbo a Fifth Circuit case dealing with a trade secret Footnote 2 the existence of one trade secret supports the verdict is what Carbo said and in that case there were nine trade secrets being debated about The issue That's in relation to a sufficiency of the evidence question whereas with respect to the bill versus by it seems to me there's a legal argument that the theory is improper because it's foreclosed by the agreement So there's a couple of different arguments they make Wait, wait, wait Don't stray from what I'm asking No, no Bill versus by is a legal question I don't believe it is The question is Why is it a sufficiency of the evidence question? Because the question is they were given confidential information With respect to the financial information with respect to unreleased products there's no dispute in this case that they were given trade secret information They've not appealed that So the question of use under Texas law under law of any state is that That's a jury question for the jury to determine whether you've used it for improper means And under well logics the types of things No, no, no It's a legal question as to whether the agreement the nondisclosure agreement gave them the right to use this material to make a bill versus by decision That's not a sufficiency question It's a legal question isn't it? Well No And here's the reason Number one the language which is quoted on page ten of our brief is that the information was given in strict confidence for the limited You're arguing that the district court got it right No But what my question is is is that question a sufficiency of the evidence question? It's not a sufficiency It is a sufficiency of the evidence question because it's not a contract interpretation question First of all this is a trade secret claim not the breach of contract Why isn't the contract interpretation of the question? Because the question is whether they used the information for a purpose other than what was allowed by the contract Well the question is what is the contract allowed to be used for? The contract's clear Nobody said it was unambiguous That's a merits argument And and so the question is whether they went beyond using the information for the financial condition for determining the financial condition of the other That's the quote from the contract itself That question of whether they went beyond is something that the jury had to determine Both Sorry Maybe you can correct me if I have a misapprehension of what the position is here but it seems to me that that the way to look at this is to say what the contract says is you're interested in potentially purchasing this company and you want to look at this information to decide whether you want to go forward with that proposal and there would be therefore as a matter of law there's nothing wrong with looking at that information as part of making that decision Your position if I understand it is they went beyond that authorized purpose as a matter of fact and that they used this information for purposes that weren't authorized by the contract by its terms That's correct That's your position That's correct That they used that information to design build market and sell ambient light sensors rather than using it for the purposes of determining whether to purchase us So it's not just a question of hey were they making a theoretical decision about whether to build us build their own or to buy They're using our information to make their decision to build They did in fact build They did in fact use that information So under a breach of contract that would be a sufficiency of the evidence question Under trade secret also a sufficient But this is confusing because you do allege that some of the technology was improperly used but that seems to be a different question than presented by this first trade secret about build versus buy which is I understand focused entirely on the question of whether they were going to buy or whether they were going to build right But it's use of the confidential information and the trade secret information in the context of limited purpose It's not that argument doesn't concern whether they use the technology in building That trade secret relates only to the question of whether they should build versus buy right No I think that's something that gets lost in the papers It's not just the issue of could they make a decision to build versus buy How do I know that? Because the evidence at trial was that they were using But in terms of the definition of what the trade secret was that was being put to the jury How do I know that the build versus buy went beyond that? Because the question was whether they designed revamped their design How from the jury from the instructions to the jury What was the instruction on that? The instruction to the jury was that the plaintiff was that they used the trade secrets to conduct a build versus buy to determine whether the defendant should design and build the defendant's competing ambient light sensors Okay But that doesn't talk about using the information to build It talks about using the information to make a choice I think it does Your Honor It's Appendix 75 Use the plaintiff's trade secret to conduct a build versus buy analysis to determine whether the defendant should design and build the defendant's competing ambient light sensors So it was during the course of that discussion And more importantly Your Honor after those negotiations ended they definitely used the information to redesign their products So this argument that they were allowed to do these things during due diligence after due diligence ended and it's only two weeks later that they changed their design based upon the design of an unreleased product the TSL 2560 And let me just mention a point about that that goes to the I see that I'm out of time So let me just finish here That this use of the TSL 2560 which used the interleaved one-to-one photodiode array was something  came up with after it applied for a patent and had a previous product the 2550 in the marketplace and determined through use and trial and error and research and development and expenditure of money that a better way to use these exposed and shielded dials was to put them together in this interleaved one-to-one ratio and as a result it kept that information a trade secret and there's no dispute that the TSL 2560 that used that design was the first of its kind and was not released to the public and that that Intersil copied that design in coming out with its first generation product so it accelerated its development. I think we're out of time. Thank you. Thank you, Your Honor. Thank you, Your Honor. I'll try to be as brief as I can. Judge Bryson, you asked my friend about the KNG case. It speaks not at all to damages but only to liability. What it said is that the the fact that somebody could independently discover it does not absolve from liability. And Wellogix? Wellogix I did not come prepared to answer to but I think I think it stands for the same proposition. But KNG and Wellogix in both cases in either case reverse engineering would cut off the causal chain with regard to damages. So that's I think exactly the point that Judge Dyke was getting at in his colloquy with my friend. Judge Bryson, as we've said before we'll get you the trial exhibit that we've been talking about. I just would like to point you to the Ratliff's report in the appendix which is A10405 A10412 and A10415 which goes through with some detail some of the things that Ratliff was attracted to. No of course I'm just I'm giving that to you now and we'll provide you with whatever we can after. Yeah I'm after that but I go ahead. Okay I'm beating Can I ask you we've talked about the one-to-one intervening trade secret the builder-by-trade secret there's a third one why what's wrong with the third one? The third one which is Something about plastic plastic plastic I'm sorry I thought I'd answered plastics I thought I'd answered that in my opening I'll return to it and it's that initial inter-sill design which took place four months before were entitled under the confidentiality agreement to use information that we came up with already and it's already in there documented four months beforehand But why might the cost information you got during the that summer 2004 I think it was not have led you to not contemplate the change? Well there was no change contemplated and in fact if you look at that exhibit you'll see that competitive intelligence at that point was already telling inter-sill that Taos is on the market and the plastic was going to be able to make our products cheaper and more competitive with them With regard to the build vs. buy it's absolutely a legal question absolutely a question of contract interpretation and in fact my friend's colloquy with Judge Bryson shows that build vs. buy is just another way of inflaming the jury to argue once again the technical trade secret issue which isn't there Finally on the jury trial right my friend mentioned kokish which was very clear that disgorgement requires that this is quoting from the case at page 1640 disgorgement requires that the defendant give up those claims properly attributable to the defendant's interference with the claimant's legally protected rights it is not at all about the plaintiff's damages it is about the defendant's what they generated Now if I could just very quickly I perhaps you're not familiar you suggested with the Wellogics case Wellogics does say and it's it's Fifth Circuit case on Texas law refer to the compensatory damages and then includes among the list of compensatory damages the defendant's actual profits from the use of the secret so while that may not actually close the loop it seems to me it gets pretty close to saying that in this context at least the defendant's profits can be a measure of compensatory damages which would seem to indicate a jury trial right wouldn't you think I can agree with you in so far as you say can be they weren't here if for example this worked strictly a one to one that the proof was that every sale we made was a sale they lost then maybe a disgorgement award properly limited with expenses and attribution and that sort of thing would actually be their damages but again I come back to the fact for a jury to decide and that could be for a jury to decide if that were the claim that were being put forth what would be the argument that it wouldn't be for a jury to decide in that context it's not for the jury to decide where the disgorgement is strictly about give up your money it's not in any way tied to their in the circumstances that you just outlined where you said it could be compensatory that wouldn't necessarily imply jury right wouldn't it I think if it is compensatory I think we've agreed in our briefs that a compensatory award is damages as that term is understood and that would be durable in 1789 we're saying that argument now being made on appeal on the record of this case is not tenable and really the best proof is that their damages claim the one where they showed their injury was a royalty claim that was a fraction of the amount of the disgorgement claim thank you all very much thank both counsel the case is submitted